770 A.2d 1045

**Donald Glenn TROTT,**

v.

**STATE of Maryland.**

**No. 2066, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

April 25, 2001.

Michael R. Malloy, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Leigh S. Halstad, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Frank Weatherbee, State's Attorney for Anne Arundel County, Annapolis, on the brief), for appellee.

Submitted before MOYLAN,* SALMON, KRAUSER, JJ.

KRAUSER, Judge.

In this appeal, we are asked to consider once again the question of when an on-the-street inquiry by a police officer becomes a seizure of the inquiree under the Fourth Amend-

---

* Moylan, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

ment to the United States Constitution. Although viewed by some as a quagmire of quibble, this area of the law, with all its niggling distinctions, lies at the heart of maintaining a free, just and ordered society. To that end, we willingly enter the maze of precedent that has developed around this issue in the hope of emerging with our common sense intact and our decisional law enhanced.

Appellant, Donald Glenn Trott, was convicted of second degree burglary after a bench trial on an agreed statement of facts in the Circuit Court for Anne Arundel County. He was subsequently sentenced to a term of ten years' imprisonment, five years of which were suspended.

Before trial, appellant unsuccessfully moved to suppress the fruits of his crime and his statements to police on the ground that, when he was initially approached and questioned by a police officer about the equipment in his possession, he was in effect "seized" by that officer who, according to appellant, had no reasonable articulable suspicion that appellant was involved in criminal activity. Therefore, according to appellant, his "seizure" and subsequent arrest were in contravention of the Fourth Amendment. The denial of that motion by the circuit court forms the basis of this appeal.

## BACKGROUND[1]

At the hearing on appellant's motion to suppress, testimony was presented that on February 19, 1999, at approximately 3:23 a.m., Anne Arundel County Police Officer Middleton was walking down a residential street, Bellerive Drive, when he heard a loud crash. At that time, he was in uniform and on duty.

---

1. As appellant is only challenging the denial of his motion to suppress, we shall advert only to the testimony taken at the hearing on that motion unless otherwise indicated. *See Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987) (citing *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438 (1982)) (In reviewing the denial of a motion to suppress, an appellate court considers only the record of the suppression hearing and not of the trial itself.)

Moments later, he observed appellant pushing a woman's bicycle with a "kid's tote . . . attached to the back" up Bellerive Drive. The street was well lit, and, as appellant approached, Officer Middleton could see that the tote contained a weed whacker, a snow blower, a large tire, and a tow hitch. At the suppression hearing, Officer Middleton testified:

I observed a subject walking up [Bellerive] [2] Drive pushing a female bicycle that had a caption [sic] on the back of the bicycle commonly carried two children [sic]. It was a double—they call it a kid's tote that's attached to the back of the bicycle. And loaded in the back in the kid's tote, I observed a snow blower, a weed whacker and a large . . . tire and capacity tow hitch[ ] that were loaded in the back of this tote. And there was a white male pushing the bicycle up the hill, and that's when I first observed him. He was on the street pushing the bicycle with all these items in the back.

"[B]ecause it was 3:30 in the morning . . ." and it "looked completely out of place," Officer Middleton walked over to appellant, who was on the other side of the street. He asked appellant "what he was doing with the items and the bicycle." In reply, appellant stated that, on the way home, his pick-up truck had broken down, and "he did not want to leave the materials in the back of the pick-up truck." When he gave his name upon the officer's request, Middleton immediately recognized it as the name of someone who "ha[d] been involved in numerous break-ins in the past."

Officer Middleton then radioed for a back-up unit. While on the radio, he was advised by another officer to "be careful" because appellant "was wanted and to hold on to him, because he was going to run."

As the field interview progressed, the officer, either knowing that appellant had no driver's license or playing a hunch that he did not have one, commented on that fact. In response, appellant stated that his brother had been driving the

2. Bellerive Drive was mistakenly identified as "Belarey Drive" in the transcript of the suppression hearing.

truck when it broke down. Worried that appellant might have overheard the radio transmissions and concerned that appellant was growing more "nervous" and "jittery," the officer placed appellant in handcuffs for, as he put it, "his and my safety." Officer Middleton then ran a warrant check and learned that there was an outstanding warrant for appellant's arrest. The officer placed appellant under arrest at approximately 3:35 a.m., twelve minutes after he had first approached appellant.

Departing from the record of the motion to suppress,[3] we note that the next day the police were contacted by a "Mr. Weber." He advised the police that very early that morning he and his son had "heard a noise . . . out back" but, seeing nothing, had gone back to bed. When they awoke later that day, they discovered that the "storage shed located toward the rear of [their] home" had been broken into and that, among the items stolen, was a woman's bike, a weed whacker, a snow blower, and a "tot tote." Upon arriving at the police station, they identified the items taken from appellant as the property that had been stolen from their storage shed.

At the conclusion of the suppression hearing, the circuit court denied appellant's motion to suppress the items seized, finding that Officer Middleton's initial stop of appellant was based upon a reasonable articulable suspicion that appellant was engaged in criminal activity. The court also denied appellant's motion as to the statements he made to the officer, concluding that appellant had voluntarily made those statements to police.

## DISCUSSION

### I

Appellant contends that his "initial stop" by the police officer constituted a seizure and that the officer seized him

---

3. The facts contained in this paragraph were taken from the agreed statement of facts read into the record at appellant's trial and were not before the suppression court. We include them only to present a complete picture of the circumstances of this case.

without a reasonable articulable suspicion of criminal activity and thereafter arrested him without probable cause. Therefore, appellant claims, the circuit court erred in failing to grant his motion to suppress. We disagree.

■ When the officer walked over to appellant and asked who he was and what he was doing—an encounter that appellant characterizes as the "initial stop"—no seizure occurred within the meaning of the Fourth Amendment. Even if one did, the officer had a reasonable articulable suspicion to make that "stop." Moreover, the arrest that followed was supported by probable cause.

■ In reviewing a denial of a motion to suppress, we accept the findings of fact made by the circuit court, unless they are clearly erroneous. *See Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State*, 83 Md.App. 341, 346–47, 574 A.2d 356 (1990). Our review is based solely upon the record of the suppression hearing. *See In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691 (1997). And we review that record in the light most favorable to the prevailing party. *See Riddick*, 319 Md. at 183, 571 A.2d 1239; *Cherry v. State*, 86 Md.App. 234, 237, 586 A.2d 70 (1991). We review *de novo*, however, all legal conclusions. *See Riddick*, 319 Md. at 183, 571 A.2d 1239. In other words, this Court must make its own independent constitutional determination of whether the encounter in question and subsequent arrest of appellant were lawful. *Id.; Perkins*, 83 Md.App. at 346, 574 A.2d 356.

■ The Fourth Amendment proscribes unreasonable searches and seizures, but not every encounter between a citizen and a police officer constitutes a "seizure." As the Supreme Court observed in *Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "[s]treet encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations . . . ."

▮ Nor does police questioning transform such an encounter into a seizure. "Mere police questioning does not constitute a seizure. This is so even if the police lack any suspicion, reasonable or otherwise, that an individual has committed a crime or is involved in criminal activity, because the Fourth Amendment simply does not apply." *Ferris v. State*, 355 Md. 356, 374–75, 735 A.2d 491 (1999) (internal citations omitted). Indeed, "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Such an encounter has been dubbed, for better or worse, an "accosting." Unfortunately, the term itself, though no doubt intended to be a neutral description of actions taken by a police officer to trigger an encounter, connotes a confrontational and unwelcome act by the investigating officer and thereby begs the question whether the subject of the "accosting" was intimidated by the officer's conduct.[4] The better and more neutral term, we believe, is "inquiry." For the purposes of this opinion, however, we will use the terms interchangeably as we fear that the term "accosting" is too well rooted in the case law to be extirpated.

▮ "Typically, an accosting occurs when police officers approach a citizen and ask for information, usually one's name, address, date of birth, destination, point of origin, and con-

---

4. In *Reynolds v. State,* this Court used the following dictionary definition to describe "accosting:"

> to approach and speak to; speak to without having first been spoken to; to confront, usu[ally] in a somewhat challenging or defensive way; to address abruptly (as in a chance meeting) and usu[ally] with a certain degree of impetuosity or boldness; . . . .

*Reynolds v. State,* 130 Md.App. 304, 322, 746 A.2d 422 (1999), *cert. denied,* 358 Md. 383, 749 A.2d 173, *and cert. denied,* —— U.S. ——, 121 S.Ct. 178, 148 L.Ed.2d 122 (2000) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1986)).

tents of luggage or vehicle." *Reynolds v. State,* 130 Md.App. 304, 322–23, 746 A.2d 422 (1999), *cert. denied,* 358 Md. 383, 749 A.2d 173, *and cert. denied,* —— U.S. ——, 121 S.Ct. 178, 148 L.Ed.2d 122 (2000). Such a procedure is not only constitutionally permissible but plays a pivotal role in law enforcement. A "field investigation" is "the principal investigative technique in law enforcement." *Id.* at 323, 746 A.2d 422.

> Virtually all such interviews conducted during the course of an officer's duties are done for the purpose of gathering information to ferret out criminal offenses or to elicit from witnesses facts relative to a criminal event or an ongoing investigation. We certainly recognize an officer's right— indeed, his or her responsibility—to conduct inquiries regarding criminal activity. Simply put, that is what they do.

*Id.*

Equally important is the role such inquiries play in crime prevention. Undoubtedly, the questions of a curious and street-wise police officer have ended more than one criminal enterprise before it was undertaken. Indeed, such inquiries are the heart and soul of good police work. Without them, "those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). To restrict the police from making such inquiries subjects the public to unnecessary perils without a compensating enhancement of constitutional rights.

█ As this Court has previously observed, " '[b]ecause an individual is free to leave during such an encounter, he [or she] is not "seized" within the meaning of the Fourth Amendment.' " *Reynolds,* 130 Md.App. at 322, 746 A.2d 422 (quoting *United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir. 1990)). In other words, "[e]ven when the officers have no basis for suspecting criminal involvement, they may generally ask questions of an individual 'so long as the police do not convey a message that compliance with their request is re-

quired.' " *Ferris,* 355 Md. at 375, 735 A.2d 491 (quoting *Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). If, however, "the police, in some way, communicate to a reasonable person that he or she was not free to ignore the police presence and go about their business, then the Fourth Amendment is implicated." *Id.* at 375, 735 A.2d 491.

We are not unmindful of the fact that few (and perhaps we are being generous with that estimate) ever avail themselves of the opportunity to leave or decline to answer questions. But there are a variety of reasons for that phenomenon, many of which do not necessarily involve fear of arrest or abuse at the hands of the police. In fact, the test reasonably "assumes that the citizen is aware of police duties to keep the peace and prevent crime, and that that 'awareness, coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate.' " 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE, A TREATISE ON THE FOURTH AMENDMENT, § 9.3(a), at 100 n. 58 (3rd ed., 1996) (quoting *United States v. Tavolacci,* 895 F.2d 1423 (D.C.Cir.1990)). That assumption, of course, does not include those who are contemplating, engaged in, or have completed a criminal act. But "the 'reasonable person' test presupposes an *innocent* person." *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). And the focus is on the conduct of the investigating officer and not the subjective response of the person being questioned. *See Michigan v. Chesternut,* 486 U.S. 567, 573–74, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) ("This reasonable person standard . . . ensures that the scope of the Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.").

Moreover, "[w]hile most citizens will respond to a police request," the Supreme Court observed in *Delgado,* "the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Delgado,* 466 U.S. at 216, 104 S.Ct. 1758. The Fourth Amendment is therefore not implicated unless, as we stated earlier, "the circumstances of the encounter are so

intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded...." *Id.* at 216, 104 S.Ct. 1758.

█ In making that determination, we are to consider the totality of the circumstances surrounding the encounter. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Ferris,* 355 Md. at 376, 735 A.2d 491; *Jones v. State,* 319 Md. 279, 283, 572 A.2d 169 (1990). "We conclude," the Supreme Court declared in *Mendenhall,* "that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870. The test, however, is an "objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

In *Mendenhall,* the Supreme Court gave the following "[e]xamples of circumstances that might indicate a seizure:" "the threatening presence of several [police] officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870. "In the absence of some such evidence," the Court cautioned, "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to seizure of that person." *Id.* at 555, 100 S.Ct. 1870.

In a later case involving the pursuit by officers in a police car of a suspect on foot, the Court added several other factors for consideration: whether the police had (1) "activated a siren or flashers;" (2) commanded the individual to "halt"; (3) "displayed any weapons;" (4) "operated their car in an aggressive manner to block [the individual's] course or otherwise

control the direction or speed of his movement." *Chesternut*, 486 U.S. at 575, 108 S.Ct. 1975 ·

Citing *Mendenhall*, the Court of Appeals in *Ferris* stated that "the test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a 'consensual' non-constitutional event is whether a reasonable person would have felt free to leave." *Ferris*, 355 Md. at 375, 735 A.2d 491 (citing *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870). It further explained:

> If a reasonable person would have felt free to leave, no seizure occurred. Conversely, if a reasonable person would have felt compelled to stay, a seizure took place. The focus, then, is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." [*Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)]. The key inquiry has also been characterized as whether "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* at 437[, 111 S.Ct. 2382] (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)).

*Id.* at 375–76, 735 A.2d 491.

In support of his contention that Officer Middleton's initial approach was not an accosting, but a seizure, unsupported by reasonable articulable suspicion, appellant relies principally on *Jones v. State*, 319 Md. 279, 572 A.2d 169 (1990). In that case, Jones was observed by a police officer at approximately 3:20 a.m., riding his bicycle. Clothing that appeared to be on hangers and covered with plastic was draped across his shoulders and a grocery-type plastic bag hung from his handle bars. "[B]ecause of recent burglaries in the area and because Jones was traveling from the direction of a dry cleaning establishment located six blocks away," *id.* at 281, 572 A.2d 169, the officer's suspicions were aroused. "As Jones approached, [the officer] exited his vehicle and asked Jones to stop ... [and] he said something to the effect of 'Hey, could

you come here' or 'Hold on a minute.' " *Id.* As Jones got off the bicycle, the officer "noticed a bulge in [Jones's] jacket pocket that appeared to be a handgun." *Id.* Upon patting him down, the officer found a .25 caliber pistol and placed Jones under arrest. "A search of the grocery bag revealed 14 capsules containing cocaine, a quantity of marijuana, one pack of rolling paper, and a billfold containing five smaller vials of cocaine." *Id.* Apparently, Jones had just left his mother's house, which was only twenty feet away, when he was stopped by the officer. He was enroute to a party at his girlfriend's house, where he intended to change into the clothing he was transporting.

In *Jones,* the Court of Appeals "conclude[d] that Jones was seized at the moment the officer commanded him to stop," *id.* at 285, 572 A.2d 169, and that the officer "lacked a reasonable suspicion to justify the stop of Jones." *Id.* at 287, 572 A.2d 169. The Court reasoned:

The officer's conduct was tantamount to a formal demand compelling the individual to comply and a reasonable person would not have felt free to ignore the officer's command to stop. The officer was dressed in uniform and driving a marked patrol car. As Jones approached, the officer pulled his car to the side of the road, exited the vehicle, and stood in the street when he called out to Jones using one of three salutations—"Hey, could you come here" or "Hold on a minute" or "Hey, wait a minute." It seems reasonable for Jones to feel constrained to stop. He was operating a bicycle on a public highway and it would be an offense under the Maryland Vehicle Law for him willfully to disobey any lawful order or direction of any police officer.

*Id.* at 285, 572 A.2d 169 (internal citations omitted).

Although appellant was stopped while using a bicycle during the early morning hours, the similarity of the instant case to *Jones* ends there. Moments before appellant came into view, Officer Middleton, while patrolling on foot, heard a loud crash in a quiet residential neighborhood. He then observed appellant pushing a woman's bicycle up the street. Attached to the

rear of the bicycle was a children's tote that contained an odd and suspicious assortment of equipment—a snow blower, a weed whacker, a large tire and a tow hitch, just the sort of equipment one might find in a garage or storage shed. He later testified: "Well, my hair raised, because it was 3:30 in the morning, and the subject had all these items loaded in the back of the tote. It looked completely out of place...."

In contrast to *Jones*, although in uniform, Officer Middleton did not drive up in a police car; he was on foot when he approached appellant. Nor did he summon appellant or order him to stop as the investigating officer did in *Jones*, effectively compelling Jones to get off of his bike. Instead, he walked over to appellant and, without giving any commands or requiring any action from appellant, asked what he was doing and who he was. There is no evidence that his tone of voice was anything but conversational or that his behavior was threatening. Nor were the questions he asked unusual or inherently threatening or intimidating. They were routine questions, typical of any lawful accosting. *See Reynolds*, 130 Md.App. at 322–23, 746 A.2d 422. In fact, they were not nearly as detailed as the questions approved by this Court in *Reynolds*. In that case, we stated: "Typically, an accosting occurs when police officers approach a citizen and ask for information, usually one's name, address, date of birth, destination, point of origin, and contents of luggage or vehicle." *Id.*

Moreover, unlike in *Jones*, had appellant chosen to ignore the questions posed by Officer Middleton, he would not have been in violation of a "lawful order or direction of any police officer," *Jones*, 319 Md. at 285, 572 A.2d 169, a criminal offense under the Maryland Motor Vehicle Law and a factor stressed by the *Jones* Court in reaching its conclusion that Jones's submission to police authority was not voluntary. In so ruling, the Court stated that "[t]his was not a situation where the officer merely approached Jones on the street to ask him if he was willing to answer some questions." *Id.* at 286, 572 A.2d 169. That, of course, is precisely the situation here and why the instant case is clearly distinguishable from *Jones*.

Finally, there was no evidence that Officer Middleton was armed or, if he was, that his weapon was visible. Presumably, the officer had a weapon, but in the early hours of a February morning, it is quite likely that it was not visible. But, even if it were, it is unlikely that the sight of a holstered weapon on a police officer would surprise or intimidate any citizen. We expect and even count on our police officers, in uniform or in plain clothes, to be armed. The more important question is whether, at any time during the encounter, the officer drew or pointed his weapon, *see In the Matter of T.T.C.,* 583 A.2d 986, 988 (D.C.1990), or referred to it.

In *Ferris v. State, supra,* as noted earlier, the Court of Appeals provided further guidance for ascertaining when an encounter between a civilian and the police becomes a seizure. In that case, Ferris was pulled over by a Maryland State Trooper for speeding. The trooper had clocked Ferris's vehicle at ninety-two miles per hour in a sixty-five mile per hour zone. Inside the vehicle were Ferris and one front-seat passenger. When the trooper asked Ferris for his driver's license and registration, he noticed that "Ferris's 'eyes were bloodshot and he did appear a little nervous, a little fidgety.' " *Ferris,* 355 Md. at 362, 735 A.2d 491. After returning to his patrol car to request a driver's license and outstanding warrant check, the trooper noticed that Ferris and his passenger "were moving around and looking back towards him 'quite frequently.' " *Id.* While the trooper was writing a citation, a deputy sheriff arrived and parked his patrol car behind the trooper's and activated his vehicle emergency "flashers." *Id.* He too noticed Ferris and his passenger moving around a lot in the vehicle and glancing back towards the officers. The trooper returned to Ferris's vehicle with the deputy, who stood at the rear of the vehicle. After Ferris had signed a citation and his license and registration had been returned, along with a copy of the citation, the trooper asked him " 'if he would mind stepping to the back of his vehicle to answer a couple of questions.' " *Id.* at 363, 735 A.2d 491. Ferris responded that " 'he didn't mind.' " *Id.* The reasons that the trooper asked Ferris "to step out of the car were that [Fer-

ris's] eyes were bloodshot, [Ferris] and the passenger were acting very nervous, and there was no detectable odor of alcohol on [Ferris's] breath." *Id.* The trooper suspected " 'some drug use.' " *Id.* at 363 n. 2, 735 A.2d 491.

Standing behind the vehicle, the trooper asked Ferris if he had been smoking drugs before the traffic stop. He denied it at first, but when asked again by the trooper, Ferris admitted that he and his passenger had smoked a "joint" about three hours earlier. In response to further questioning by the trooper, Ferris admitted that his passenger possessed a small amount of marijuana. After the passenger turned over to the officers a small baggie containing marijuana and a search of the vehicle uncovered more marijuana, Ferris was arrested.

At the beginning of its analysis, the Court noted that the facts presented two distinct police stops: the initial traffic stop, which ended when a citation was issued to Ferris and his license and registration were returned, and the post-traffic stop detention, which began when the trooper subsequently requested that Ferris step behind the car to answer a few questions. The Court explained:

> It is without dispute that the stop of Ferris by [the trooper] for exceeding the posted speed limit constituted a seizure for Fourth Amendment purposes, but that such a seizure was justified by the probable cause possessed by the trooper in having witnessed Ferris's traffic violation. Indeed, Ferris does not contest the initial stop. The real issue lies in the actions taken by the officer after he had issued the speeding citation to [Ferris] and had returned his driver's license and registration to him.

*Id.* at 369, 735 A.2d 491.

Acknowledging that "the inquiry is a highly fact-specific one," the Court summarized the factors that other courts have identified as "probative of whether a reasonable person would have felt free to leave," *id.* at 377, 735 A.2d 491, as follows:

> the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated

him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

*Id.*

After considering the totality of the circumstances surrounding Ferris's arrest, the Court concluded "that a reasonable person in Ferris's position would not have believed that he was free to terminate the encounter with [the trooper] when the trooper asked him 'if he would mind stepping to the back of his vehicle.'" *Id* . Indeed, such a person, the Court concluded, "would have reasonably believed he was neither free to leave the scene nor to ignore and disobey the police officer's 'requests.'" *Id.* at 378, 735 A.2d 491. The Court explained:

A host of factors gives rise to our determination that Trooper Smith's prolonged encounter with Ferris was a seizure under the Fourth Amendment. First and foremost is the prior existence of the initial traffic seizure of Ferris. This pre-existing seizure enhanced the coercive nature of the situation and the efficacy of the other factors in pointing toward the restriction of Ferris's liberty. The situation faced by Ferris was markedly different from that of a person passing by or approached by law enforcement officers on the street, in a public place, or inside the terminal of a common carrier. We find significant the following circumstances: the trooper never told Ferris that he was free to leave, the trooper's "request" of Ferris to exit the vehicle seamlessly followed the pre-existing lawful detention, the trooper removed Ferris from his automobile, the trooper separated Ferris from the passenger, there were two uniformed law enforcement officers present, the police cruiser emergency flashers remained operative throughout the entire encounter, and it was 1:30 a.m. on a dark, rural interstate highway. Given the cumulative effect of these circum-

stances, a reasonable person would not have felt free to terminate the encounter.

*Id.* at 378–79, 735 A.2d 491 (internal citations omitted).

In contrast to *Ferris,* no "lawful detention" preceded Officer Middleton's encounter with appellant. Therefore, unlike *Ferris,* appellant's cooperation cannot be attributed to a misimpression that the officer's questions were all part of a lawful detention pursuant to a valid traffic stop. Nor were patrol cars with flashing lights or other uniformed officers present.[5] Officer Middleton was alone and on foot when he approached appellant. There is no evidence that his patrol car was visible or near the scene of the encounter. The encounter, moreover, did not occur on a "desolate, rural interstate highway," but on a well lighted residential street. *Id.* at 383, 735 A.2d 491.

More important, appellant was never asked by Officer Middleton to stop or to change his location as Ferris was. The entire encounter took place at precisely the same spot. In *Ferris,* the Court of Appeals was particularly troubled by that aspect of the Ferris encounter. The Court asserted that the trooper "affirmatively sought to move Ferris from the relative comfort of his vehicle to a more coercive atmosphere," between his car and the two patrol cars. *Id.* at 382, 735 A.2d 491. To underline the importance of that fact, the Court

---

**5.** In *Mendenhall,* the Supreme Court cited the "threatening" presence of police officers, not the mere presence of such officers, as a factor in determining the coercive nature of the encounter. The difference lies in whether the officers are simply present or being used to intimidate the subject or create a restraint on his freedom of movement. *See United States v. Berry,* 670 F.2d 583, 592 (5th Cir.1982) (en banc) ("Blocking an individual's path or otherwise interrupting him to prevent his progress in any way is a consideration of great, and probably decisive, significance."); *see also Horvitz v. State,* 433 So.2d 545, 547 (Fla.App. 4 Dist.1983) (Suspect was surrounded by three police officers for questioning concerning illegal drugs.); *People v. Cantor,* 36 N.Y.2d 106, 111, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975) ("[D]efendant deprived of his freedom of movement when he was encircled by three police officers as he stood alongside his car which was blocked by the police vehicle."); *Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994) (Seizure of two defendants occurred when they were confronted by four officers in train station and they continued to back away from officers for five to ten feet until they were backed up to wall).

noted that "[h]aving the driver 'exit his vehicle ... shifts control away from the driver to the officer. No longer could [the driver] simply turn the ignition key and drive away. Instead, in order to leave, he had to affirmatively reverse an action previously requested by the officer—he had to *get back into* his car." *Id.* at 382–83, 735 A.2d 491 (quoting George M. Dery III, "WHEN WILL THIS TRAFFIC STOP END?": THE UNITED STATES SUPREME COURT'S DODGE OF EVERY DETAINED MOTORIST'S CENTRAL CONCERN—Ohio v. Robinette, 25 FLA. ST. U.L.REV. 519, 556 (1998)). In the instant case, however, no request was made that appellant take any action except to answer a few questions.

Moreover, the failure of Officer Middleton to inform appellant that he was free to leave, plays a far less important role in the instant case than it did in *Ferris*. By not advising Ferris, at the conclusion of the traffic stop, that he had a right to leave, the police left him with the impression that the questions which followed were part of his continued detention. The Court observed:

> The moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, *i.e.,* the time at which the driver may depart. The trooper's immediate transition into the inquiry was so seamless that a reasonable motorist would not have believed that the initial, valid seizure had concluded.

*Ferris*, 355 Md. at 379, 735 A.2d 491.

Finally, there is no evidence that by word or deed the officer communicated to appellant that he could not leave. And as the Supreme Court stressed in *Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)), " 'knowledge of the right to refuse consent' " is not " 'a *sine qua non* of an effective consent' " but just " 'one factor to be taken into account.' "

The most recent case in which this issue was addressed by this Court is *Reynolds v. State*, 130 Md.App. 304, 746 A.2d 422 (1999). In that case, at approximately 3:30 in the afternoon, two uniformed officers in a marked patrol vehicle observed a group of approximately ten individuals, which included Reynolds, on a street corner. "One of the individuals yelled 'five–0' and the group immediately began to disburse." *Id.* at 310–11, 746 A.2d 422. As Reynolds walked away from the group, the officers "pulled their vehicle along the sidewalk on which [Reynolds] was walking, exited the car, and approached him." *Id.* at 311, 746 A.2d 422. When the officers asked Reynolds his name and date of birth, he gave it. Reynolds was then detained for approximately five minutes while the officers waited for the results of a warrant check. After the officers received information that there were outstanding warrants for his arrest, they arrested and searched him. As a result of that search, they retrieved from Reynolds a number of baggies containing crack cocaine.

While acknowledging that " 'a mere accosting' " provokes no constitutional inquiry, this Court stated in *Reynolds* that it was "persuaded from the totality of the circumstances that the accosting in [*Reynolds* ] constituted a show of authority that would indicate to a reasonable person that compliance with the requests of the police was required." *Id.* at 344, 746 A.2d 422. We therefore concluded based upon "the circumstances surrounding [Reynolds's] five-minute detention," while he waited for the officers to receive the results of the warrant check, that a seizure had occurred in violation of the Fourth Amendment. *Id.* at 344, 746 A.2d 422.

In reaching that result, this Court relied upon the factors enunciated in *Ferris* and others for determining whether a seizure had occurred. In particular, we relied upon the length of the detention "without any further meaningful interchange between [Reynolds] and the officers," *id.* at 338, 746 A.2d 422, "the lack of any apparent justification for [the] inquiry," *id.* at 337, 746 A.2d 422, "[t]he act of ... singling out [Reynolds]," *id.* at 338, 746 A.2d 422, the lack of any advisement that he was free to go, and the act of uniformed police officers

alighting from a marked patrol car. *Id.* at 339–40, 746 A.2d 422. These circumstances and others, we concluded, established that Reynolds's detention by police was a seizure.

In the instant case, appellant was not singled out from a crowd, nor was he subjected to a detention "without any interchange" with Officer Middleton. In fact, there was no lapse in the "interchange" between appellant and Officer Middleton during their entire encounter. More important, he was not approached by the officer "without any apparent justification." In fact, the officer, for reasons we are about to discuss, approached appellant because of a reasonable articulable suspicion that appellant was involved in criminal activity.

Moreover, in *Reynolds,* this Court observed that, "notwithstanding that the encounter occurred in the middle of the afternoon on a public street and sidewalk, that [Reynolds] was in the process of departing from that location is a circumstance which is inconsistent with his voluntary consent to remain there for any period of time." *Id.* at 343, 746 A.2d 422. In the instant case, however, appellant was not attempting to evade, or walk away from, Officer Middleton when he was approached by the officer. And for his part, Officer Middleton, unlike the officers in *Reynolds,* did not intercept appellant or alter his course of travel. Appellant was free to keep walking in the direction he was going.

As to the failure to advise appellant that he was free to leave, we note that this factor has been cited as a consideration principally in three situations: (1) where police have requested the subject's consent to a search; *United States v. Washington,* 151 F.3d 1354, 1355–56 (11th Cir.1998) (Federal agent boarded bus, held a badge over his head, and after asking to see the defendant's ticket and identification, asked to search the defendant's belongings and person.); *Guadalupe v. United States,* 585 A.2d 1348, 1359 (D.C.1991) (During the thirty minutes between initial confrontation and his arrest, defendant was approached twice and asked to consent to search of his bag and then of his body.); *State v. Dezso,* 512 N.W.2d 877, 881 (Minn.1994) (Officer asked defendant to see

his wallet.); (2) where police have asked the subject to change his or her location to facilitate questioning; *United States v. Glover,* 957 F.2d 1004, 1009 (2nd Cir.1992) (Officer requested that Glover leave the public area of the terminal and go with him to the security office.); *Buffkins v. City of Omaha,* 922 F.2d 465, 469 (8th Cir.1990) (Officers asked defendant to accompany them to the office but informed her sister that she was free to go.); *United States v. Hill,* 626 F.2d 429, 435 (5th Cir.1980) (Officer requested that defendant accompany him to the airline office.); or (3) as in *Ferris,* at the conclusion of a traffic stop, when questioning continues. *State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762, 764 (1997) (Where police requested permission to search defendant's car after the traffic stop had ended.). Parenthetically, we note, however, that *Ferris* also falls within the second category as well, namely, "where police have asked the subject to change his or her location to facilitate questioning."

Obviously, none of these circumstances exist in the case *sub judice.* No request was made by the investigating officer in the instant case to search appellant nor did the officer request that he change his location. Moreover, appellant was not the subject of any pre-existing detention such as a traffic stop. In each of these three instances, a police advisement was arguably warranted. The right to decline a warrantless search of one's person or property is a fundamental right. A request by police to accompany them to a more isolated or coercive setting is by its very nature suspect, unless of course the subject is advised he or she is free to go. And continued questioning by the police after a traffic stop has ended may warrant such an advisement because of the motorist's likely confusion, as noted by the Court of Appeals in *Ferris,* over whether the questioning is a continuation of the traffic stop. Moreover, as if to underline why the unique circumstances of a post-traffic stop interrogation warrant a "free to go" advisement, the *Ferris* Court stressed that "[t]he situation faced by Ferris was markedly different from that of a person passing by or approached by law enforcement officers on the street." *Ferris,* 355 Md. at 378, 735 A.2d 491.

 In short, although giving such an advisement in an uncomplicated street encounter may establish its voluntariness, the absence of such an advisement does not cast doubt on the consensual quality of that encounter. Therefore, the failure of Officer Middleton to advise appellant of his right to leave before he asked him who he was and what he was doing with the suspicious assortment of items in his possession is of negligible importance in determining the voluntariness of that short and nonintrusive encounter.

The next consideration is whether Officer Middleton's suspicion that appellant might be engaged in criminal activity when he approached him should play any role in assessing the voluntariness of that encounter. Suspicion of criminal activity has generally been deemed to be a consideration in cases where "police indicated to the person that she was suspected of a crime or was the specific target of police investigation." *United States v. McCarthur,* 6 F.3d 1270, 1275 (7th Cir.1993); *see also United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985) (A consensual encounter became an investigatory stop when DEA agents informed an individual in an airport terminal that they "suspected [he was] transporting drugs and asked permission to search his luggage."); *United States v. Berry,* 670 F.2d 583, 603 (5th Cir.1982) (Officer's indication to defendants that they were suspected drug dealers was a factor in determining if a seizure occurred in an airport.).

Whatever suspicions Officer Middleton may have harbored, he never expressed them to appellant. As we stated earlier, *our focus is not on what the officer thought but on what he did.* In that regard, we note that the only action taken by the officer was to ask appellant two questions: who was he and what was he doing. These two nonthreatening questions were ostensibly as consistent with an interest in helping appellant as they were with a suspicion of wrongdoing. We therefore accord whatever suspicions the officer might have harbored at the time he approached appellant no weight or even relevance in our analysis.

In addition, we should approach with caution the notion that the status of an individual, that is, whether he is under suspicion or not, be given significant weight. To do so, would provide those suspected of a crime with Fourth Amendment protection while denying it to those who are not. As at least one legal authority has noted:

[I]t is not correct to say that "Fourth Amendment rights are implicated" whenever "the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity," but not when "the officer acts for other proper reasons." This is certainly in error to the extent that it would remove the protections of the Fourth Amendment from those who do not happen to be suspected of criminal activity.

4 WAYNE R. LaFAVE, SEARCH AND SEIZURE, A TREATISE ON THE FOURTH AMENDMENT, § 9.3(a), at 106 (3rd ed.1996) (footnotes omitted).

Moreover, if suspicion is a determinative factor, then we are compelled to conclude that the police may accost someone if they have a reasonable articulable suspicion or if they have no suspicion, but not if they have only a slight suspicion of criminal activity. Such exquisite calibrations are best suited to the tightly controlled conditions of a laboratory, not the often messy realm of human affairs.

In sum, the instant case is clearly distinguishable from *Jones, Ferris,* and *Reynolds.* Unlike *Jones,* it did not involve a "command to stop" which, if disobeyed, constituted an offense under the Maryland Vehicle Law. Unlike *Ferris,* it did not involve a pre-existing detention, an attempt by police to isolate the subject, the presence of two uniformed [6] police

---

**6.** Although the fact that police are in uniform has been mentioned by this Court and others as a factor, we believe that in most instances it should be accorded little weight. There is no evidence that an identifying uniform is more intimidating than an oral identification accompanied by flashing a badge. Furthermore, unless engaged in criminal activity, most members of the public would rather be approached on a vacant street in the middle of the night by an individual wearing a police uniform, as occurred here, than one who is not.

officers and two patrol cars with flashing lights, or a "desolate, rural" setting. Unlike *Reynolds*, it did not involve a detention "without any further meaningful interchange between" the subject and the police, "the lack of any apparent justification for [the] inquiry," "the act of . . . singling out [the subject]," an intentional interference with the subject's clear intention to leave the area, or uniformed police officers alighting from a marked patrol car. In short, the case *sub judice* presents a classic consensual encounter: after hearing a loud noise, a lone police officer approached on foot an individual who was transporting a suspicious and incongruous load of equipment on a residential street at 3:30 a.m., who might or might not have had something to do with that noise. He did not interfere with the individual in any way except to ask him who he was and what he was doing. The individual gave no sign of wishing to avoid or discontinue the encounter and, without hesitation, answered the officer's questions. Unfortunately for him, the officer was familiar with his name and reputation. The encounter was patently consensual. To rule otherwise simply because the officer was in uniform and may have harbored some suspicions regarding what appellant was up to is to prohibit routine police inquiries in all but a narrow set of circumstances.

Moreover, it would lead to absurd results. Let's assume that suspicions of a uniformed and presumably armed police officer are aroused when he sees an individual involved in what could be criminal activity in the early hours of a winter's morning, as we have here. To ask a few clarifying questions of that individual, must he strip off his uniform, toss his gun in the bushes, and approach the individual in his underwear to ensure that his inquiry will not be deemed by a reviewing court an unlawful seizure? A contrary ruling by this Court could leave the officer with the choice of either performing his duty ungarbed and unprotected or not performing it at all.

## II

Even if we assume that the initial encounter between Officer Middleton and appellant ripened into a seizure, that

seizure was supported by a reasonable articulable suspicion and therefore was a lawful stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry,* the Supreme Court held that police officers may stop persons to investigate possible criminal activity. *Id.* at 22, 88 S.Ct. 1868. A valid investigatory stop, commonly called a *"Terry* stop," requires only that "the police have specific articulable facts which, taken together with rational inferences from those facts, create reasonable suspicion that the person has been or is about to be involved in criminal conduct." *Aguilar v. State,* 88 Md.App. 276, 281, 594 A.2d 1167 (1991) (citing *Terry* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)).

In *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the Supreme Court explained:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Id.* at 330, 110 S.Ct. 2412. Reasonable suspicion is " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "The concept of reasonable suspicion purposefully is fluid because 'like probable cause, [it] is not readily, or even usefully, reduced to a neat set of legal rules.' " *Cartnail v. State,* 359 Md. 272, 286, 753 A.2d 519 (2000) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)) (internal quotations omitted). *See also Derricott v. State,* 327 Md. 582, 587, 611 A.2d 592 (1992) (A police officer may stop a suspect "if the officer has a reasonable suspicion supported by articulable facts that crimi-

nal activity may be afoot.") (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). It is a standard well below that of probable cause. *See Alabama v. White*, 496 U.S. at 330, 110 S.Ct. 2412 (1990) ("[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause."); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause."); *Baziz v. State*, 93 Md.App. 285, 293, 612 A.2d 296 (1992) ("The quantity and quality of evidence required to create reasonable suspicion under the stop and frisk exception to the Fourth Amendment warrant requirement is significantly less than that required to show probable cause. . . ."). Finally, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

In the instant case, during the early hours of a February morning, Officer Middleton heard a loud noise and then, moments later, observed appellant pushing a woman's bicycle along the street. Attached to the rear of that bicycle was a children's tote loaded with a snow blower, a weed whacker, and a five thousand pound capacity tow hitch. Based upon the loud noise, the time of day, the possession by appellant of a woman's bicycle with a children's tote attached, and the incongruous combination of items in the tote, the investigating officer had a reasonable articulable suspicion to stop appellant.

Furthermore, after learning appellant's identity, noting the changes in appellant's story and knowing his reputation for criminal activity, the officer had a reasonable articulable suspicion to detain appellant briefly while he continued his investigation. The stop lasted no longer than necessary for the officer to confirm his suspicions. Minutes after initiating the encounter, Officer Middleton, upon learning that there was an outstanding warrant for appellant's arrest, placed appellant under arrest.

■

## III

Appellant contends that even if the stop was justified, his handcuffing by Officer Middleton transformed that stop into an "arrest." That arrest was illegal, appellant claims, because the officer did not have, at that time, probable cause to arrest him.

■ We disagree for three reasons: First, the handcuffing of appellant was justifiable as a protective and flight preventive measure pursuant to a lawful stop and did not necessarily transform that stop into an arrest. Second, even if it did, the officer had probable cause, at that time, to arrest appellant. And third, even if the officer lacked probable cause to arrest appellant at the moment he handcuffed him, he had probable cause to do so a few moments later when he received a teletype confirming that there was an outstanding warrant for appellant's arrest. Since no evidence was obtained during the very brief interval between the handcuffing and the teletype there is nothing to suppress on the ground that the handcuffing was an unlawful arrest.

■ In conducting an investigative stop, a police officer may use "physical force" as long as it is reasonable. *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868; *Watkins v. State*, 288 Md. 597, 610, 420 A.2d 270 (1980) ("[U]se of reasonable force to effectuate an investigative detention of a suspect is not an impermissible seizure under the fourth amendment to the United States Constitution."). Reasonable force may be used to prevent a suspect's flight, and such force may include handcuffing that suspect. *United States v. Crittendon*, 883 F.2d 326 (4th Cir.1989) (Handcuffing burglary suspect to prevent his flight deemed reasonable during an investigative stop.).

■ Indeed, handcuffing does not necessarily transform a "stop" into an "arrest," as we acknowledged in *Farrow v. State*, 68 Md.App. 519, 525, 514 A.2d 35 (1986) (citing *United States v. Taylor*, 716 F.2d 701 (9th Cir.1983)). In fact, there is widespread agreement among the federal courts that, under

certain circumstances, the handcuffing of a suspect during an investigative stop would not constitute an "arrest." *United States v. Jones*, 973 F.2d 928, 931 (D.C.Cir.1992) ("A *Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable."); *Crittendon*, 883 F.2d at 329 ("Brief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances."); *United States v. Gil*, 204 F.3d 1347 (11th Cir.2000) (Handcuffing of female suspect for seventy-five minutes while officers searched her house was appropriate detention under *Terry* stop.); *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir.1999) ("[D]rawn guns and handcuffs do not necessarily convert a detention into an arrest," and did not where suspected armed burglar was handcuffed while officer investigated the allegedly stolen money and the other suspect's alibi which took ten to twenty-five minutes.); *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir.1996) ("[P]ointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest."); *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir.1996) ("[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest—for which probable cause is required—when the circumstances reasonably warrant such measures" and did not here when officer reasonably believed suspects were wanted for armed robbery.); *United States v. Smith*, 3 F.3d 1088, 1096 (7th Cir. 1993)("[T]here was a legitimate *Terry* stop and no unreasonable seizure of the persons of the three appellants, even though they were handcuffed prior to arrest."); *United States v. Saffeels*, 982 F.2d 1199 (8th Cir.1992) (Handcuffing suspect does not convert stop into arrest.); *United States v. Bautista*, 684 F.2d 1286 (9th Cir.1982) (Handcuffing appropriate in an investigative stop when suspect flight risk.).

And there is considerable support among the state courts for the proposition that handcuffing a suspect does not necessarily transform a *Terry* detention into a full blown arrest. *Hicks v. United States,* 730 A.2d 657, 660 (D.C.1999) (Handcuffing suspects for fifteen to twenty-five minutes "to secure the safety of the officers, and the presence of the suspects" until an identification occurred was permissible under *Terry* stop.); *People v. Foster,* 85 N.Y.2d 1012, 630 N.Y.S.2d 968, 654 N.E.2d 1216 (1995) (Handcuffing of defendant by officer on foot was lawful investigative detention where burglary of clothing store suspected and confirmed by radio transmission shortly thereafter.); *Howard v. State,* 664 P.2d 603, 609 (Alaska Ct.App.1983) ("[D]rawn guns and handcuffing do not necessarily turn a stop into an arrest."); *Reynolds v. State,* 592 So.2d 1082, 1085 (Fla.1992) (*"Terry* and its progeny [do not] prohibit placing a suspect in handcuffs during the course of an investigative detention where the circumstances reasonably warrant such action."); *State v. DuValt,* 131 Idaho 550, 961 P.2d 641, 645 (1998) ("[T]he use of the handcuffs did not transform the investigative detention into an arrest.") *State v. Reid,* 135 N.H. 376, 605 A.2d 1050 (1992) (Use of handcuffs to detain agitated suspect until he could be identified by officer as burglar was permissible under investigative stop.); *Spenner v. City of Sioux Falls,* 580 N.W.2d 606 (S.D.1998) (Handcuffing of suspect was lawful part of investigative stop and did not transform stop into an arrest.); *State v. Wheeler,* 108 Wash.2d 230, 737 P.2d 1005 (1987) (Handcuffing unarmed suspect to transport him short distance to scene of burglary for identification was permissible under *Terry* stop.).

We find that, under the circumstances of this case, Officer Middleton's decision to handcuff appellant was a reasonable exercise of police powers during a lawful investigative stop. After hearing a loud crash in a residential neighborhood at 3:30 in the morning, and shortly thereafter observing appellant in possession of an incongruous and suspicious assortment of equipment, the officer approached appellant. As soon as appellant gave his name, the officer knew he was dealing with someone known to be involved in "break-ins." When appel-

lant changed his story and the officer was warned over the radio that he was wanted and would "run," his suspicions that flight was imminent grew. Fearing that appellant had heard the radio transmission and growing apprehensive as appellant became increasingly "nervous" and "jittery," the officer, who was alone and on foot, handcuffed appellant. His only other alternative would have been to pull his gun and that might have turned an investigative stop into a lethal encounter. Given the hour, the fact that Officer Middleton was alone, the officer's suspicions that appellant had just committed a crime (burglary), the presence of potential weapons within appellant's reach (the equipment in the tote), and the growing risk that appellant might flee, we find Officer Middleton's conduct was reasonable and a proper part of his investigative stop.

This is not to suggest that every time a police officer handcuffs a suspect that that restraint is not an arrest. In fact, in most instances, placing a suspect in handcuffs does amount to an arrest, which must then be supported by probable cause. *See, e.g., In re David S.*, 135 Md.App. 363, 369, 762 A.2d 970 (2000) (Where officer observed suspected drug transaction, "order[ing] [defendant] to the ground and plac[ing] him in handcuffs [ ] required probable cause, which the officer failed to demonstrate."); *Dixon v. State*, 133 Md.App. 654, 673, 758 A.2d 1063 (2000) (Officers, who were notified by informant of details of proposed drug transaction in parking garage, arrested defendant when "they blocked his car, removed him from his vehicle, and handcuffed him."). We hold, however, that, under the circumstances of this case, Officer Middleton's use of handcuffs was a justifiable part of his *Terry* stop, and that act alone did not elevate the investigative stop to an arrest.

In any event, at the time Officer Middleton placed appellant in handcuffs, as we stated earlier, he did have probable cause to arrest appellant. Probable cause is defined as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown,

that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). *See also Woods v. State,* 315 Md. 591, 611, 556 A.2d 236 (1989).

We need not recite once again, however, the facts and circumstances of appellant's detention by Officer Middleton in concluding that the officer had probable cause to arrest appellant at .the time he handcuffed him. Suffice it to say that as previously outlined by this opinion there was more than sufficient evidence for a reasonably prudent person to believe that appellant had committed a crime.

Finally, as we previously stated, even if the handcuffing of appellant constituted an unlawful arrest, it did not result in the seizure of any evidence. Moreover, within minutes of the handcuffing, a warrant check performed by the officer confirmed the existence of an outstanding warrant for appellant's arrest, providing sufficient probable cause to transform the handcuffing into a lawful arrest.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**