# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | I.D. No. 2105013317 |
| | ) | |
| MONTREZ BROWN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: November 30, 2022
Decided: January 11, 2023

## <u>OPINION</u>

*Upon Defendant's Motion to Suppress*
**DENIED**

Kevin B. Smith, Esquire, Department of Justice, Dover, Delaware, *Attorney for the State.*

Zachary A. George, Esquire, Hudson, Jones, Jaywork & Fisher, Dover, Delaware, *Attorney for Defendant.*

**Primos, J**.

This is the Court's decision regarding the Motion to Suppress Evidence of Defendant Montrez Brown (hereinafter "Mr. Brown"). This case involves the warrantless stop and subsequent search of Mr. Brown's vehicle. For the reasons that follow, the Court finds that the initial stop was supported by reasonable suspicion of a violation of the traffic code and the search of the vehicle was justified by probable cause that the vehicle contained either contraband (specifically, marijuana) or evidence of related crimes. Accordingly, Mr. Brown's motion to suppress is **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts cited herein are those presented during the suppression hearing held on October 19, 2022. The State presented testimony from Sergeant Lloyd McCann (hereinafter "Sergeant McCann"), a Delaware state trooper, and video footage from the mobile video recorder ("MVR") device on the front of Sergeant McCann's state vehicle.[1]

On May 25, 2021, shortly after 11 p.m., Sergeant McCann was on patrol in an unmarked police car, and turned into the Capital Park neighborhood, which he testified to be a high-crime area.[2] A dark sedan driven by Mr. Brown passed Sergeant McCann's vehicle, travelling in the opposite direction, and exited the Capital Park neighborhood.[3] Out of his sideview mirror, it looked to Sergeant McCann as though the sedan's rear license plate was not illuminated as it passed,[4] in violation of 21 *Del. C.* § 4334(c).[5] He made a U-turn and followed the sedan.[6]

---

[1] The video footage was entered into evidence as State's Exhibit 1 [hereinafter "Ex. 1"].
[2] Suppression Hr'g Tr. (hereinafter "Hr'g Tr.") at 15:22–19:8.
[3] *Id.* at 18:11–17.
[4] *Id.* at 18:20–23.
[5] "Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear." 21 *Del. C.* § 4334(c).
[6] Hr'g Tr. at 19:12–17.

After confirming his suspicion, he activated his emergency lights, initiating a traffic stop as Mr. Brown's vehicle turned into a hotel parking lot.[7] Mr. Brown's vehicle pulled into a parking space and Sergeant McCann stopped his vehicle behind the sedan.[8] He then exited and approached the driver's side of the sedan. He asked Mr. Brown about the unilluminated registration plate light, which Mr. Brown attributed to mechanical or electrical issues with his vehicle.

While speaking with Mr. Brown, Sergeant McCann detected the odor of marijuana coming from the sedan.[9] He returned to his police car and ran routine inquiries on his computer, checking whether Mr. Brown's license and registration were valid and whether there were any outstanding warrants for his arrest. While he ran his inquiries, he observed that Mr. Brown had previously been charged with disregarding a police officer's signal.[10] Based on this name and the charge, Sergeant McCann realized that Montrez Brown was the same individual who had, several months earlier, led another police officer in a vehicular pursuit (rather than

---

[7] While Mr. Brown's license plate is illuminated by Sergeant McCann's headlights for much of the MVR recording, at roughly 27 seconds into the video, Mr. Brown's vehicle turns left outside of the other vehicle's light, and the plate appears dark and unreadable. *See* Ex. 1 at 0:26–27. Sergeant McCann testified on redirect that he was "about 25 feet" from Mr. Brown's vehicle at that time. Hr'g Tr. at 74:6–10.

[8] On cross-examination, Sergeant McCann did not agree that Mr. Brown's vehicle was blocked in. Rather, his testimony was that if Mr. Brown "backed up to the right he could probably get out of the parking space" but if "he picked [sic] up straight or to the left he would hit my car." Hr'g Tr. at 56:5–6 and 56:14–15.

[9] *Id.* at 21:12–15.

[10] *See* 21 *Del. C.* § 4103(b) ("Any driver who, having received a visual or audible signal from a police officer identifiable by uniform, by motor vehicle or by a clearly discernible police signal to bring the driver's vehicle to a stop, operates the vehicle in disregard of the signal or interferes with or endangers the operation of the police vehicle or who increases speed or extinguishes the vehicle's lights and attempts to flee or elude the police officer shall be guilty of a class G felony, with a minimum fine of $575 which may not be suspended."). Upon the State's request, the Court takes judicial notice of the fact that Mr. Brown did have a pending charge for disregarding a police officer's signal as of May of 2021. Hr'g Tr. at 79:4–8; *see* D.R.E. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

submitting to a routine traffic stop) and ultimately escaped.[11] Sergeant McCann also testified that he was aware of anonymous but uncorroborated tips that Mr. Brown might have been involved in "drug dealing and/or possession of a firearm."[12]

After completing his routine inquiries, Sergeant McCann returned and asked Mr. Brown to step out of the vehicle. His stated reason for asking Mr. Brown out of the vehicle was the odor of marijuana.[13] When Sergeant McCanna asked "do you smoke any marijuana," Mr. Brown answered that he did.[14] When asked if he smoked marijuana in the car, Mr. Brown answered "sometimes" and admitted to having done so "a long time ago."[15] Upon further questioning, he also admitted to smoking marijuana earlier that day while wearing the same clothes.[16] However, when asked directly, he denied that there was any marijuana in the vehicle at the time of the stop.[17]

At that point, Sergeant McCann told Mr. Brown that he planned to search the vehicle and that he would then let him go.[18] He asked Mr. Brown to turn around and attempted to place handcuffs on him. He told Mr. Brown that he was detained (as opposed to under arrest) and that he was going to have Mr. Brown sit in the back of the police car while the search was conducted.[19] When asked why, Sergeant

---

[11] Hr'g Tr. at 22:8–11 and 23:2. Sergeant McCann explained on cross-examination that information about this pursuit was shared with all the members of the Governor's Task Force, of which Sergeant McCann was a member. *Id.* at 72:7–10.

[12] *Id.* at 23:9–19.

[13] *Id.* at 53:5–20.

[14] Ex. 1 at 6:19–21.

[15] *Id.* at 6:22–29; *see also* Hr'g Tr. at 55:5–7 ("[Question:] Mr. Brown told you that he had smoked in that vehicle a long time ago. [Answer:] Correct.").

[16] Ex. 1 at 6:30–34.

[17] *Id.* at 6:36–38.

[18] *See id.* at 6:40–45 ("I'm going to search your car real quick, alright, and then I'm going to get you on your way. So just turn around for me.").

[19] *See id.* at 6:50–55 ("Sir, I'm just detaining you right now, that's all. Okay. I'm just going to have you have a seat in the back of my car, that's all, while I check yours, that's all.").

McCann responded "because it smells like marijuana."[20] Mr. Brown started resisting at that point, lifting his arms over his head to make it difficult to place the handcuffs on him. He eventually broke free and fled on foot, with Sergeant McCann in pursuit. Mr. Brown escaped Sergeant McCann but was later apprehended by other state troopers.[21] Meanwhile, Sergeant McCann searched the vehicle Mr. Brown had left behind.[22] Inside, he found a handgun, an extra magazine and ammunition, and suspected crack cocaine.[23] Mr. Brown has since been charged with multiple offenses related to the possession of drugs, a firearm, and ammunition.

Mr. Brown submitted a motion on September 8, 2022, moving to suppress "all illegally obtained evidence in this case including a firearm, ammunition, controlled substances, paraphernalia, identification, scales, currency, and Defendant statements including those on a civil asset forfeiture form."[24] Mr. Brown argued in his motion 1) that the initial stop was unsupported by reasonable suspicion[25] and 2) that even if the stop was justified, the subsequent arrest and search of the vehicle were not supported by probable cause.[26] The State argued in its response, filed September 21, 2022, that 1) the stop was supported by reasonable suspicion of an equipment violation[27] and 2) that there was probable cause to search the car based on the odor of marijuana, Mr. Brown's admissions, and Sergeant McCann's knowledge of Mr. Brown's criminal history.[28] The Court held a suppression hearing on October 19, 2022, at which additional issues were raised, including whether the scope of the stop

---

[20] *Id.* at 6:57–59.
[21] Hr'g Tr. at 32:13–22.
[22] Sergeant McCann testified that he "believe[s]" he conducted the search "after [Mr. Brown] was taken into custody." *Id.* at 34:12–15.
[23] *Id.* at 33:14–34:4.
[24] Mot. to Suppress.
[25] *Id.* ¶¶ 9–12.
[26] *Id.* ¶¶ 13–19.
[27] State's Resp. to Def.'s Mot. to Suppress ¶ 13.
[28] *Id.* ¶¶ 14–16.

exceeded its initial justification and whether the amount of force employed turned the stop into an arrest requiring probable cause.[29]

## STANDARD

In order to justify a warrantless search and seizure, the State must establish by a preponderance of the evidence that the officer's actions complied "with the requirements of the United States Constitution, the Delaware Constitution, and any applicable statutes."[30] At a suppression hearing, the Court sits as the finder of fact and evaluates the credibility of the witnesses.[31]

## DISCUSSION

Both the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution guarantee the right to be free from unreasonable searches and seizures.[32] On occasion, the Delaware Supreme Court has interpreted state constitutional protections to extend beyond their federal counterparts, as interpreted by the United States Supreme Court.[33] However, Delaware courts will "conduct separate analyses for parallel state constitutional provisions only when a party produces particular and detailed explanations of why a separate analysis is appropriate."[34]

The events leading to the search of Mr. Brown's vehicle can be broken into four distinct phases. First, there was the initial traffic stop to investigate an equipment violation. Second, the stop was extended to investigate the odor of marijuana, and Mr. Brown was required to step out of his vehicle. Third, Sergeant McCann attempted to handcuff Mr. Brown and announced his intent to search the

---

[29] Hr'g Tr. at 99:12–100:14.
[30] *State v. Garnett*, 2021 WL 6109797, at *3 (Del. Super. Dec. 23, 2021).
[31] *Id.*
[32] *Pollard v. State*, 284 A.3d 41, 46 (Del. 2022).
[33] *Id.*
[34] *Backus v. State*, 202 A.3d 1126, 2019 WL 327963, at *3 (Del. 2019) (TABLE).

6

vehicle (prompting Mr. Brown's immediate resistance and flight). Fourth and finally, Sergeant McCann searched the vehicle that Mr. Brown had left behind. The Court will address each in turn.

## I. Initial Stop of the Vehicle

Mr. Brown first argues that the initial stop of his vehicle was unsupported by reasonable suspicion and that it was a pretextual stop, i.e., that Sergeant McCann stopped his vehicle in the hopes of discovering more serious criminal activity than an unilluminated license plate.

A traffic stop is a seizure within the meaning of the Fourth Amendment and Article I, § 6.[35] Specifically, a routine traffic stop is a form of investigatory detention (also known as a "*Terry* stop"), for which an officer must have reasonable suspicion of criminal activity.[36] Delaware police officers possess statutory authority to conduct investigatory stops pursuant to 11 *Del. C.* § 1902, which provides that an officer may stop a person in a public place when the officer has "reasonable ground to suspect" that the person is "committing, has committed or is about to commit a crime."[37] Consistent with constitutional requirements, Delaware courts construe "reasonable ground" to mean "reasonable and articulable suspicion."[38] Whether an officer has reasonable suspicion is judged "in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[39] Moreover, an officer must be able to

---

[35] *Diggs v. State*, 257 A.3d 993, 1004 (Del. 2021).
[36] *Id.*
[37] 11 *Del. C.* § 1902(a).
[38] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).
[39] *Diggs*, 257 A.3d at 1004 (quoting *Jones*, 745 A.2d at 861).

identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion."[40]

At the outset, it does not affect the analysis if, as Mr. Brown contends, Sergeant McCann was motivated in whole or in part by a desire to uncover more serious criminal activity than a mere equipment violation. Both the United States Supreme Court and the Delaware Supreme Court have rejected the argument that "pretextual" stops are unreasonable seizures, so long as objective facts support the officer's conclusion that reasonable suspicion existed to investigate even a minor traffic offense.[41]

Here, Sergeant McCann had a reasonable and articulable suspicion that Mr. Brown was violating a traffic law, specifically 21 *Del. C.* § 4334(c), which requires a vehicle's license plate to be illuminated and clearly visible from 50 feet away. The officer's testimony that the license plate appeared unilluminated from roughly 25 feet behind the vehicle, which was corroborated by the MVR video, is more than enough to establish that he had reasonable suspicion to initiate a stop at that time.[42] Thus, the initial stop was reasonable and did not violate Mr. Brown's rights under the Fourth Amendment or Article I, § 6.

---

[40] *Jones*, 745 A.2d at 861 (alteration in original) (quoting *Coleman v. State,* 562 A.2d 1171, 1174 (Del. 1989)).

[41] *See Whren v. United States*, 517 U.S. 806, 813–14 (1996) (rejecting the propositions that "the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved" or "whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given"); *Juliano v. State*, 254 A.3d 369, 386–87 (Del. 2020) [hereinafter "*Juliano I*"] (concluding that Article I, § 6 of the Delaware Constitution does not compel a different result than *Whren*).

[42] *See Malloy v. State*, 462 A.2d 1088, 1091 (Del. 1983) (holding that officers' inability to "see the plate at a distance of 75 feet" created reasonable suspicion to stop the car and "to investigate the possible equipment defect" under 21 *Del. C.* § 4334(c)).

8

## II.    Extension of the Stop to Investigate the Odor of Marijuana

That the initial stop was reasonable does not end the inquiry.  While an officer may stop a vehicle to investigate even a seemingly minor traffic violation, the Delaware Supreme Court held in *Caldwell v. State* that "[t]he duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop."[43]  In a routine traffic stop, "[o]nce the officer has issued a citation or warning and has run routine computer checks, the vehicle must be released unless the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation."[44]  It is the *Caldwell* rule, rather than a subjective rule against pretextual stops, that protects motorists from unreasonable intrusions in the guise of routine traffic code enforcement.[45]  The Court must engage in a "a fact-intensive inquiry to ensure that the pursuit of the investigation unrelated to the traffic violation is not unreasonably attenuated from the initial purpose of the stop."[46]

Here, when Sergeant McCann pulled Mr. Brown over, he had reasonable suspicion only of an equipment violation.  However, when he approached the vehicle to speak with Mr. Brown, he detected the odor of marijuana.  "As a general matter, 'a trained and experienced police officer can develop a justifiable suspicion when an untrained lay person might not. This frequently comes into play when an officer relies upon his sense of smell in suspecting that an illegal substance is present.'"[47]

---

[43] *Caldwell v. State*, 780 A.2d 1037, 1047 (Del. 2001) (citing *Florida v. Royer,* 460 U.S. 491, 498 (1983)).

[44] *Id.*

[45] *See id.* at 1048 ("This standard respects the State's interest in investigating suspicious conduct during a valid traffic stop, while restricting police officers' authority to employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements."); *Juliano I*, 254 A.3d at 389 ("In striking this balance, *Caldwell,* in our view, provides an appropriate measure of protection for motorists against arbitrary police conduct of the kind alleged in this case.").

[46] *Juliano I*, 254 A.3d at 389.

[47] *Juliano v. State*, 260 A.3d 619, 630 (Del. 2021) (en banc) [hereinafter "*Juliano II*"] (quoting *Houston v. State*, 251 A.3d 102, 114 (Del. 2021)).

While possession of a personal use amount of marijuana is no longer a crime in Delaware, the odor of marijuana emanating from a recently moving motor vehicle is indicative of at least two possible criminal offenses: consumption of marijuana in a moving vehicle[48] and driving under the influence.[49]  However, as discussed in more detail in Part IV of this opinion, the Delaware Supreme Court recently held in *Juliano II* that the odor of marijuana alone is insufficient to establish probable cause to arrest a vehicle's occupant.[50]

Nonetheless, since reasonable suspicion is a less stringent standard than probable cause, the odor of marijuana may provide reasonable suspicion to extend a stop even where, as here, it would be insufficient to establish probable cause to arrest.[51]  That Sergeant McCann knew Mr. Brown had just been driving the sedan sets this case apart from *State v. Rose*, in which this Court held, based on the analysis in *Juliano II*, that where officers detected the odor of marijuana emanating from a parked vehicle and the "officers never saw Defendant operating the vehicle, they did not have reasonable suspicion that he had used or consumed marijuana in a moving vehicle or that he was driving under the influence."[52]  Here, based on the odor of marijuana emanating from a recently moving vehicle, it was reasonable for Sergeant McCann to extend the stop to question Mr. Brown about the timing and extent of his marijuana use.  Moreover, the possible innocent explanations for the odor provided

---

[48] 16 *Del. C.* § 4764(d).
[49] 21 *Del. C.* § 4177(a)(2).
[50] *Juliano II*, 260 A.3d at 631.
[51] *See In re D.D.*, 277 A.3d 949, 964 (Md. 2022) ("[A] particular circumstance or set of circumstances may satisfy the reasonable suspicion standard but fall short of probable cause. That is precisely the case with respect to the odor of marijuana."); *Lefebvre v. State*, 19 A.3d 287, 295 (Del. 2011) ("[T]he commission of a traffic offense combined with an odor of alcohol, standing alone, do not constitute probable cause to arrest for a DUI offense. Nevertheless, those two facts may give rise to a reasonable suspicion of DUI and justify a request that the driver perform some field sobriety tests." (internal citation omitted)).
[52] 2022 WL 2387803, at *6 (Del. Super. June 30, 2022).

10

by Mr. Brown do not negate reasonable suspicion—it is well established that "reasonable suspicion 'need not rule out the possibility of innocent conduct.'"[53]

Finally, Sergeant McCann did not require any additional evidence of criminal activity, beyond that justifying the extension of the stop, to order Mr. Brown out of the vehicle. The United States Supreme Court held in *Pennsylvania v. Mimms* that an officer does not need an independent justification to order a driver out of a vehicle under the Fourth Amendment because the additional intrusion, beyond the stop itself, is "de minimis."[54] The Delaware Supreme Court has yet to hold that Article I, § 6 compels a different result, and Mr. Brown has not offered a "particular and detailed" explanation as to why the Delaware Constitution would require more of an officer to justify ordering a driver out of his vehicle.[55] Thus, under the facts of this case, Sergeant McCann was allowed to extend the stop and to order Mr. Brown out of the vehicle.

## III.  Attempt to Handcuff Mr. Brown

Mr. Brown next argues that when Sergeant McCann attempted to handcuff him, this show of force, combined with the placement of the police car behind his vehicle, was in effect an arrest without probable cause. Mr. Brown is correct that "[a]n unreasonably intrusive stop may constitute a *de facto* arrest requiring probable

---

[53] *West v. State*, 143 A.3d 712, 717–18 (Del. 2016) (quoting *Moore v. State,* 997 A.2d 656, 667 (Del. 2010)); *see also State v. Francisco Perez*, 239 A.3d 975, 984 (N.H. 2020) ("Reasonable suspicion may be based upon activity that is consistent with both guilty and innocent behavior.").
[54] *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it."); *cf. Backus*, 2019 WL 327963, at *2 ("If an officer can ask a legally stopped driver to exit his vehicle as a matter of course for the officer's safety, then, *a fortiori*, an officer can certainly ask a legally stopped driver to exit his vehicle when, as here, the officer has a particularized concern for his safety.").
[55] *See Backus*, 2019 WL 327963, at *3 (declining to "decide whether Article I, § 6 of the Delaware Constitution produces a different result" because the defendant had "not made any particular argument that Delaware's search-and-seizure protections compel a different conclusion than federal search-and-seizure protections").

11

cause."[56]  For example, in *Darling v. State*, the Delaware Supreme Court found that under the "unique circumstances" of that case, in which police carried out "a plan to surround Darling at gunpoint and order him to the ground," the officers' actions went beyond an investigatory stop and "constituted an arrest under both the United States Constitution and the Delaware Constitution."[57]  This distinction "between a 'stop' and an 'arrest' is important because an arrest requires probable cause—more than reasonable, articulable suspicion—in order to be reasonable."[58]  A *Terry* stop crosses the line to become a *de facto* arrest "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[59]  Mr. Brown points to two aspects of the stop in particular that he argues make it more akin to a formal arrest: Detective McCann's (failed) attempt to handcuff him and the placement of the police car, which he argues blocked him into the parking spot.

There are no bright line rules for determining when handcuffs may be used in a *Terry* stop.  However, it is well-settled that there is no *per se* rule that handcuffs transform a stop into an arrest.[60]  As the Delaware Supreme Court stated in *Flowers*,

---

[56] *Flowers v. State*, 195 A.3d 18, 25 (Del. 2018); *see also United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010) ("In certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause.").

[57] 768 A.2d 463, 465 (Del. 2001).

[58] *Flowers*, 195 A.3d at 25.

[59] *State v. Murray*, 213 A.3d 571, 577 (Del. 2019) (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1017 (7th Cir. 2006)).

[60] *See United States v. Coker*, 223 Fed. Appx. 136, 141 (3d Cir. 2007) ("[T]here is no per se rule that pointing guns at people or handcuffing them constitute[s] an arrest." (alteration in original) (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995))); *United States v. Fornia-Castillo*, 408 F.3d 52, 64 (1st Cir. 2005) ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid *Terry* stop into a de facto arrest."); *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) ("The amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight, or drawing guns where law officers reasonably believe they are necessary for their protection." (internal citations omitted)); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983)

"[a] *Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable."[61]  Other courts have observed that "the trend developing since *Terry* has been to include within the rubric of investigatory stops in some circumstances 'the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.'"[62]  On the other hand, courts have cautioned that handcuffs substantially aggravate the intrusiveness of a stop and must be justified by the particular circumstances, and may not be used as a matter of course.[63]

---

("[T]he use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, do [sic] not necessarily convert a *Terry* stop into an arrest necessitating probable cause.").

[61] *Flowers*, 195 A.3d at 25 (alteration in original) (quoting *United States v. Jones*, 973 F.2d 928, 931 (D.C. Cir. 1992)).

[62] *People v. Archuleta*, 980 P.2d 509, 513 (Colo. 1999) (en banc) (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir.1994)).

[63] *See United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) ("[J]ust as the law does not categorically assume that handcuffing transforms every stop into an arrest, so the law does not categorically assume that every investigatory stop related to particular crimes requires handcuffing . . ."); *Reynolds v. State*, 592 So. 2d 1082, 1085 (Fla. 1992) ("We do not suggest that police may routinely handcuff suspects in order to conduct an investigative stop. Whether such action is appropriate depends on whether it is a reasonable response to the demands of the situation."). Some jurisdictions' formulations of the rule for *de facto* arrest appear to require a specific showing of danger to the officer. *See, e.g.*, *Reagan v. Idaho Transp. Dep't*, 502 P.3d 1027, 1035 (Idaho 2021), *as amended* (Mar. 23, 2021) ("[T]he threshold for showing that handcuffs were a reasonable precaution for officer safety is high."); *People v. King*, 16 P.3d 807, 814 (Colo. 2001) ("[I]n order to characterize a forceful encounter as an investigatory stop, the prosecution must establish the existence of *specific facts or circumstances* that render the degree of force used a reasonable precaution for the protection and safety of the investigating officers."); *Bailey*, 743 F.3d at 340 ("The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat.").  However, those cases do not address the use of handcuffs where there was little particularized danger to the officer but specific reasons to worry that the suspect might flee.  The Court in *Bailey*, for example, left open "the possibility that, in other cases, the government may be able to point to circumstances supporting a reasonable basis to think that even an unarmed person poses a present physical threat or **flight risk warranting handcuffing**." *Id.* (emphasis supplied).

In sum, whether a show of force, including the use of handcuffs, is reasonable depends on the specific facts of the case.[64] Courts to address this issue have identified a wide range of relevant factors, including, *inter alia*, the nature of the suspected crime, the suspect's behavior, the length and location of the stop, the time of day, and the number of officers and police cars involved.[65] However, the touchstone of the analysis is ultimately the reasonableness of an officer's actions in light of the totality of the circumstances, making some "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[66]

Here, the number of officers (one) and time of day (11 p.m.) weigh in favor of Sergeant McCann's decision to use handcuffs. Moreover, while Mr. Brown was initially cooperative, Sergeant McCann knew of a specific incident in which Mr. Brown had fled instead of submitting to a routine traffic stop, giving rise to a reasonable inference that he might attempt something similar again. In addition, the duration of the stop (whatever it might have been had Mr. Brown not fled and escaped) was only a few minutes, and Mr. Brown spent no time at all actually handcuffed or in the back of Sergeant McCann's police vehicle.

Maryland's intermediate appellate court dealt with comparable facts in *Trott v. State*.[67] In that case, an officer, while patrolling alone on foot at night, stopped a burglary suspect on the side of the street.[68] The officer radioed for backup, and when

---

[64] *See State v. Parks*, 95 A.3d 42, 50 (Del. Super. 2014) ("[T]here has been and can be no bright line drawn between the permissible and impermissible degree of force or modes of restraint for an investigative detention. Instead, whether the means used to effect or the circumstances of an investigatory stop were reasonable must be decided on a case-by-case basis." (internal citation omitted)).

[65] *Flowers*, 195 A.3d at 29 n.46 (collecting cases and factors).

[66] *Id.* at 29 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

[67] 770 A.2d 1045 (Md. Ct. Spec. App. 2001).

[68] *Id.* at 1048.

14

he gave the suspect's name, was warned "to hold on to him, because he was going to run."[69] The officer, worried that the suspect was getting nervous and might have overheard the radio transmission, placed him in handcuffs.[70] The court in *Trott* emphasized that "[r]easonable force may be used to prevent a suspect's flight, and such force may include handcuffing that suspect."[71] The court found under those circumstances that the officer's "use of handcuffs was a justifiable part of his *Terry* stop," in light of, as relevant here, the time of day, that the officer was alone, and the risk that the suspect might flee.[72] Here, like the officer in *Trott*, Sergeant McCann was alone at night with a suspect whom he had reason to believe might attempt to escape an investigatory stop.

Thus, the Court is persuaded that Sergeant McCann's attempt to place Mr. Brown in handcuffs was reasonable under the facts and thus did not rise to the level of a *de facto* arrest. This does not mean that Delaware police may routinely employ handcuffs when conducting traffic stops, absent probable cause to arrest.[73] However, in the Court's view, it is especially significant that Sergeant McCann knew that Mr. Brown had previously led an officer on a vehicular chase and successfully escaped a traffic stop. This fact, combined with the fact that the officer was alone with a suspect at night, in the vicinity of a high-crime neighborhood, and preparing to conduct a search of the vehicle (lawfully, as explained below), leads the Court to

---

[69] *Id.* at 1048–49.

[70] *Id.*

[71] *Id.* at 1062.

[72] *Id.* at 1063. *Trott* was later distinguished by Maryland's highest court in a case in which "there was no reason to believe that [the suspect] was a flight risk" and "the incident occurred in the middle of the day." *Longshore v. State*, 924 A.2d 1129, 1145 (Md. 2007).

[73] *See Trott*, 770 A.2d at 1063 ("This is not to suggest that every time a police officer handcuffs a suspect that that restraint is not an arrest. In fact, in most instances, placing a suspect in handcuffs does amount to an arrest, which must then be supported by probable cause.").

conclude that the use of handcuffs was reasonably calculated to preserve the status quo and to prevent any attempted flight by Mr. Brown.[74]

As to the positioning of his vehicle, Sergeant McCann agreed that he was parked behind Mr. Brown's vehicle and that Mr. Brown could have hit the police car if he backed out "[d]epending [on] which way he turned his car" but did not agree that "the vehicle was blocked into the parking space."[75] Given this equivocal testimony, the Court is not persuaded that the respective positions of the vehicles significantly aggravated the intrusiveness of the stop. In any event, as with the use of handcuffs, limiting Mr. Brown's ability to make or attempt a quick getaway was reasonable under the circumstances. In sum, at the point at which Mr. Brown fled the scene, he was merely stopped, not under arrest, and thus Sergeant McCann did not need probable cause to arrest in order to justify his actions at that point in the encounter.[76]

## IV.    Warrantless Search of the Vehicle

Finally, Mr. Brown argues that the search of his vehicle was unreasonable and violated the Fourth Amendment and Article I, § 6. Police may conduct a warrantless

---

[74] *Cf. Parks*, 95 A.3d at 51 (finding that the "immediate use of handcuffs [was] a reasonable step to ensure [the suspect] was secure before investigating further" where officers encountered him at night on a dark bike path).

[75] Hr'g Tr. at 69:3–9.

[76] Even if the Court were to conclude that the encounter ripened into a *de facto* arrest without probable cause, it does not follow that suppression of evidence would be required under the circumstances presented here. As explained in Part IV of this opinion, the search of the vehicle stands on its own based on the information known to Sergeant McCann before he attempted to handcuff Mr. Brown. Therefore, suppression of the evidence found in the vehicle would not be warranted. Moreover, under the inevitable discovery doctrine, "evidence obtained in the course of illegal police conduct will not be suppressed so long as the prosecution can prove that the evidence 'would have been discovered through legitimate means in the absence of official misconduct.'" *Roy v. State*, 62 A.3d 1183, 1189 (Del. 2012) (quoting *Cook v. State,* 374 A.2d 264, 267–68 (Del. 1977)). Since Sergeant McCann would have had probable cause to arrest Mr. Brown after finding the firearm and suspected cocaine in the vehicle, the evidence obtained in the course of Mr. Brown's flight and subsequent arrest would have been discovered regardless of when precisely in the encounter the arrest occurred.

16

search of a vehicle so long as they "have probable cause to believe that an automobile is carrying contraband or evidence."[77] This inquiry is distinct from whether probable cause exists to arrest—the question with respect to a search is "whether contraband or evidence will be found in a particular location" rather than "whether a criminal offense has been or is being committed by the person to be arrested."[78] Probable cause, like reasonable suspicion, is determined by "evaluating the totality of the circumstances."[79]

Since this case involves a vehicle search based in part on the odor of marijuana, a brief discussion of recent developments in Delaware law provides an important backdrop. In 2015, the General Assembly passed into law 16 *Del. C.* § 4764, which decriminalizes possession of marijuana by adults in personal use quantities but leaves in place a civil penalty for possession and provides that marijuana is still subject to civil forfeiture.[80] Consumption of marijuana in a moving vehicle also remains a criminal offense.[81] Since then, the Delaware Supreme Court has issued several decisions clarifying the impact of this legislation on the role that the odor of marijuana can have in establishing probable cause to justify a search or seizure.

---

[77] *State v. Terry*, 227 A.3d 555, 2020 WL 1646775, at *2 (Del. 2020) (TABLE) (quoting *Tatman v. State*, 494 A.2d 1249, 1253 (Del. 1985)). This exception to the warrant requirement does not, contrary to Mr. Brown's assertion, require the State to prove that exigent circumstances existed. *See id.* ("[T]here is no requirement of exigent circumstances to justify such a warrantless search." (quoting *Tatman*, 494 A.2d at 1253)); *State v. DuBose*, 2016 WL 1590583, at *8 (Del. Super. Apr. 18, 2016) ("Delaware no longer requires a proof of a particular exigency as the mobility of an automobile is a sufficient exigency to satisfy the requirement."), *aff'd*, 152 A.3d 582 (Del. 2016) (TABLE).

[78] *Dorsey v. State*, 761 A.2d 807, 812 (Del. 2000) ("Probable cause to search and probable cause to arrest are not fungible legal concepts.").

[79] *Pollard*, 284 A.3d at 46 (quoting *Valentine v. State*, 207 A.3d 166, 2019 WL 1178765, at *2 (Del. 2019) (TABLE)).

[80] 16 *Del. C.* § 4764(c)(1) and (2); *Rose*, 2022 WL 2387803, at *5.

[81] 16 *Del. C.* § 4764(d).

17

In *Valentine v. State*, the Delaware Supreme Court upheld a vehicle search after officers smelled marijuana, emphasizing that "[m]arijuana was, and remains, contraband subject to forfeiture."[82] Thus, the decriminalization of personal use possession did "not render marijuana odors, raw or burnt, irrelevant to determinations of probable cause."[83] On the facts presented, the Court concluded that the odor of marijuana, combined with the vehicle's excessive speed and the fact that it was 1 a.m., was sufficient to establish probable cause to believe that the car "contained contraband, in particular, marijuana."[84]

However, the Court later held in *Juliano II* that the odor of marijuana in a vehicle does not alone establish probable cause to place an occupant of the vehicle under arrest.[85] In that case, since the defendant was a passenger and not the owner of the car, she lacked standing to challenge the search of the vehicle. The court therefore declined to address "whether the odor of marijuana provided sufficient probable cause for that search."[86] Thus, the actual holding in *Juliano II* is a narrow one, that "under the totality of the circumstances presented by the State in this unusual case, including the vagueness of the officers' description of the marijuana odor, the timing of their detection of that odor, and the absence of any other observations indicative of criminality, Juliano's arrest was unreasonable and therefore violates" the Fourth Amendment and Article I, § 6.[87] However, the analysis in *Juliano II* suggests that, at least where probable cause is based on suspicion of criminal activity, courts "must identify the crimes that an objectively reasonable police officer might suspect to a fair probability" and analyze whether

---

[82] 2019 WL 1178765, at *2 (citing 16 *Del. C.* § 4764(c)).
[83] *Id.*
[84] *Id.*
[85] *Juliano II*, 260 A.3d at 631.
[86] *Id.* n.60.
[87] *Id.* at 622.

18

the odor of marijuana is sufficiently indicative of those crimes under the specific facts of the case.[88]

More recently, however, in *Pollard v. State*, the Delaware Supreme Court reaffirmed *Valentine*, indicating that it, rather than *Juliano II*, governs vehicle searches.[89] In *Pollard*, the Supreme Court found that under the totality of the circumstances, "the odor of marijuana emanating from the vehicle, the marijuana remnants in the console and on the floor of the vehicle, and a larger nugget of marijuana in the console of the vehicle" were together sufficient to establish probable cause that the vehicle "contained contraband or evidence of criminal activity, including consumption of marijuana in a moving vehicle in violation of 16 *Del. C.* § 4764(d)."[90] Nowhere in *Pollard* does the Court explicitly say either that the smell of marijuana would—or would not—have been sufficient to justify the search without the nuggets of marijuana lying in plain view.[91]

As the foregoing cases show, the distinction between probable cause to arrest and probable cause to search is especially important when officers search for marijuana, because marijuana is civil contraband subject to seizure even when possession is not a crime. Thus, on the facts of this case, a search could be justified by a fair probability that the car contained evidence of a crime (e.g., driving under

---

[88] *Id.* at 631–34 (identifying and discussing each of the five "crimes that an objectively reasonable police officer might suspect to a fair probability Juliano had committed based solely on the odor of marijuana.").

[89] *See Pollard*, 284 A.3d at 47 ("[T]he question is whether these facts are sufficient to establish that the officers had probable cause to believe Pollard's vehicle contained contraband or evidence of criminal activity. We conclude that, *Valentine v. State*, not *Juliano*, dictates the answer to this question.").

[90] *Id.*

[91] The Supreme Court simply noted that Pollard's assertion that "officers conducted the vehicle search based solely on the odor of marijuana . . . does not in any way address the record developed at trial." *Id.* at 46.

the influence or consumption of marijuana in a moving vehicle) *or* by a fair probability that there was marijuana in the car.

The State's position is that the odor of marijuana alone is sufficient to establish probable cause to search a vehicle for marijuana. However, neither *Valentine* nor *Pollard* relied on the odor of marijuana alone, and the Court need not do so in this case. In addition to the odor of marijuana, the State points to Mr. Brown's previous flight from a traffic stop and his admissions to having smoked marijuana in the same clothes earlier in the day and to having smoked in the car at some point.[92]

A comparison to the facts of *Valentine* is instructive. The specific holding in that case was that "[t]he totality of the circumstances, including Valentine's speed

---

[92] Closing arguments at the suppression hearing also addressed the issue of whether Mr. Brown's resistance and flight immediately after learning that Sergeant McCann intended to search the car could aid in establishing probable cause to search the car. While the Court has identified no controlling Delaware authority on this point, it finds persuasive the reasoning of the Fourth Circuit Court of Appeals in *United States v. Saafir*, in which that court held that "an officer may not manufacture probable cause by unlawful means, including by way of a false claim of legal authority that constitutes a threat to violate the Fourth Amendment." 754 F.3d 262, 266 (4th Cir. 2014) (per curiam). In that case, the court concluded that where an officer's assertion that he had probable cause to search a vehicle (when he in fact did not) elicited incriminating statements from a suspect, those statements could not then be relied upon to establish the probable cause the officer had lacked before. *Id.* at 265–66. The court reasoned that "a search is unreasonable—and so violates the Fourth Amendment—if its justification is grounded in officers['] 'engaging or threatening to engage in conduct that violates the Fourth Amendment.'" *Id.* at 266 (quoting *Kentucky v. King,* 563 U.S. 452, 462 (2011)); *see also State v. Ellis*, 279 So. 3d 901, 902 (La. 2019) (per curiam) ("[D]efendant's inculpatory statement and the evidence obtained by the deputy following the threat of an involuntary search of her person without probable cause, in violation of the Fourth Amendment, are not admissible"). While *Saafir* is not binding on this Court, its reasoning is consistent with the principles underlying the Delaware Supreme Court's ruling in *Jones v. State*, in which it held that "[i]f an officer attempts to seize someone before possessing reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially." *Jones*, 745 A.2d at 874. Accordingly, the Court will limit its probable cause inquiry to the time at which Sergeant McCann stated his intent to search—if, at that time, he had probable cause to search, then the search was lawful, and if he did not yet have probable cause, then the threat to search cannot be used to "manufacture" probable cause that was otherwise lacking.

20

(32 miles per hour above the speed limit), the time of day (1 a.m.), and the odor gave [the officer] probable cause to believe that Valentine's car contained contraband, in particular, marijuana."[93] Here, as in *Valentine,* the odor of marijuana and the time of day both support a finding of probable cause. Moreover, Mr. Brown's admissions as to where and when he smoked marijuana have a closer nexus to the possible presence of marijuana than the third factor credited by the Supreme Court in *Valentine*, that the suspect was speeding.

From the odor and these admissions, Sergeant McCann could infer that Mr. Brown was a regular user of marijuana and knew that he had consumed marijuana recently (that day) and that he had previously consumed marijuana in the vehicle. Taken together, these facts establish a "fair probability" that Mr. Brown might at very least have had marijuana in the vehicle, even if he was not actively under the influence or consuming it while the vehicle was moving. Moreover, following those admissions, Mr. Brown could not then negate probable cause by responding, when asked directly if he had marijuana in the car, with the self-serving answer that he did not. A fair probability that there was marijuana in the vehicle is all that is required under *Valentine* and *Pollard*. The Court is satisfied that the State has met that burden here.

## CONCLUSION

In summary, the Court concludes (1) that Sergeant McCann had reasonable suspicion to initiate the traffic stop to investigate a violation of 21 *Del. C.* § 4334(c); (2) that he had reasonable suspicion to extend the traffic stop based upon the odor of marijuana; (3) that it was reasonable to use handcuffs to prevent the possibility of flight under the specific facts of this case; and (4) that the totality of the circumstances, including the odor of marijuana, Mr. Brown's admissions, and his

---

[93] *Valentine*, 2019 WL 1178765, at *2.

criminal history, together established probable cause for Sergeant McCann to search the vehicle. Accordingly, the motion to suppress is **DENIED**.